## Case No. 14,517.

### UNITED STATES v. BARKER.

[1 Paine, 156.] ¹

Circuit Court, D. New York. Sept. Term, 1816.

PARTIES—PARTY IN INTEREST—UNITED STATES—
   ENDORSER ON BILL—NOTICE OF PROTEST—
      RECOVERY—DAMAGES—SET-OFF.

1. A bill of exchange endorsed to the treasurer of the United States, may be declared on in the name of the United States, and an averment that it was endorsed immediately to them will be good.

2. Inconvenience of allowing agents of the United States to sue in their own names. Danger of set-off in such cases.

3. An act of congress is not necessary to enable the United States to sue. They can, like individuals, sue in their own names, unless a different mode is prescribed by law.
[Cited in U. S. v. Shaw, 39 Fed. 436.]

4. Where the endorsee of a bill of exchange, whether as agent or owner, returns it after protest to the last endorser, the latter may sue upon it in his own name, and at the trial strike out the last endorsement although it be in full. And prior blank endorsements may be filled up at the trial so as to correspond with the declaration. And where both these were omitted to be done, the court on error, refused to reverse the judgment, considering it an objection of form, and cured by the thirty-second section of the judiciary act [1 Stat. 91.]
[Cited in Conant v. Wills. Case No. 3,087.]
[Cited in Squier v. Stockton, 5 La. Ann. 120; Bank of America v. Senior, 11 R. I. 376; Austin v. Birchard, 31 Vt. 591.]

5. Time of presentment for acceptance between New York and Liverpool. The mere lapse of three months before presentment, not evidence of delay, especially during war.

6. Whether due notice of protest was given, there being no dispute about facts, is a question of law.

7. Whether 20 per cent. damages, can be recovered in an action for the non-acceptance, but not the non-payment of a bill? Quere.

8. But where the action was commenced on the non-acceptance of the bill, and after its non-payment, but before notice of non-payment had been received, and a count on the protest for non-payment was inserted in the declaration; the 20 per cent. damages were held recoverable.

9. A citizen of the United States may lawfully, during a war with a foreign country, draw a bill on one of its subjects—such an act not leading to any injurious intercourse nor amounting to a trading with the enemy.
[Cited in Haggard v. Conkwright, 7 Bush, 16. Questioned in Woods v. Wilder, 43 N. Y. 169.]

10. Whether the United States are bound by a statute of set-off of the state in which the suit is brought? Quere.

11. The fourth section of the "act for the more effectual settlement of accounts between the United States and receivers of public money," embraces suits between the United States and any individuals, whatever may be the cause of action. The subjects of the act are not all comprehended in the title.

12. A set-off, therefore, in a suit by the United States on a bill of exchange against a private individual, where the course required by this act had not been pursued, was rejected.

13. The holder of a bill is entitled to recover at the rate of exchange, at the time of notice of the protest's being given. This is the settled law in New York. Advantages of the rule of liquidation at the par of exchange.
[Cited in Weed v. Miller, Case No. 17.346.]

14. As the plaintiff in an action on a bill has a right to recover gold·or silver, the measure of damages must be the value of the bill, at the time of notice of protest in gold or silver, and not in a depreciated or fluctuating currency.

[Error to the district court of the United States for the Southern district of New York.

[This was an action by the United States upon a certain bill of exchange against Jacob Barker. There was a judgment in the district court in favor of the United States.]

T. A. Emmet, J. O. Hoffman, and J. Wells, for the United States.

R. Tillotson and D. A. & C. Baldwin, for defendants.

LIVINGSTON, Circuit Justice. This is a writ of error to the district court of this district, on exceptions taken at the trial of the cause by the counsel for the plaintiff in error. [Case unreported.]

The first objection to a recovery, by the defendants in error, was an alleged variance between the bill of exchange declared upon, and the one given in evidence. The bill of exchange declared on, is stated to have been dated the 2d day of July, 1814, and to have been drawn by the plaintiff in error, on Thomas R. Hazard & Co. residing at Liverpool, in the United Kingdom of Great Britain and Ireland; by which bill the said Thomas R. Hazard & Co. were requested to pay, sixty days after sight, to Hallack & Barker, or order, in London, twenty-five hundred pounds sterling. This bill is further stated to have been endorsed by them to Robert Bowne, and by·him to Howland & Grinnell, and by the endorsees last named, to the United States. The bill produced on the trial, agreed with the one declared on in date. sum. and address, and the variance, if any, was in the manner of its endorsements. By the declaration it would appear, as if the endorsements were regularly filled up with the names of the several endorsees. and that the endorsement to the defendants in error. was immediately to the United States; whereas

¹ [Reported by Elijah Paine, Jr., Esq.]

all the endorsements previous to that, to the defendants in error, were in blank, and the endorsement on which this action is brought, was to Thomas T. Tucker, treasurer to the United States, and not directly to the United States.

If the United States were at all entitled to bring an action in their own name on this bill, it is contended that this could be done only by declaring according to the truth of the case, that the bill was endorsed to Mr. Tucker, and then averring that he was their agent and treasurer; and that the endorsement to him was for the use and benefit of the United States. These averments being of matter in pais, it was said, that they were of the proper province of the jury, and could only be dispensed with, where the necessary operation, or implication of law, justified a different course, which was not the case here. If it be admitted, as it must be, that where such legal intendment exists, a party may declare according to it, it is not very easy to conceive of a case, where such intendment can be stronger than in the case before the court. It is found that Mr. Tucker is treasurer of the United States; the endorsement to him is in that capacity; and when he endorsed it to the Barings, he again makes use of his official style. Nor is this all; but it appears that the bill, by an endorsement on it, before it was sent from the United States, was registered by the proper officer of the treasury department, which cannot be supposed to be done in any case in which the instrument does not belong to the government. Mr. Tucker, after such an act, could never have claimed any right to this bill. And we cannot think of any motive, which could induce a prudent man to have pursued that course with a bill belonging to himself, or any other person, even if the regulation of the department had admitted of it. But it is supposed, that before any such intendment can be made, it must appear that Mr. Tucker must have acted under some law, and that his conduct throughout comported with his duties, as prescribed by such law, and by the rules of the treasury. It is sufficient for the purpose, that he is treasurer, and appeared to have acted in that capacity, and in conjunction with another officer of that department. The court, therefore, will presume, as a jury must have done, until the contrary were shown, that in relation to this transaction he transgressed no law, and that every thing by him was regularly and correctly performed, upon the evidence apparent upon the bill itself; and no other was offered to the jury, although nothing prevented the plaintiff from introducing other testimony to this point. It was more a question of law than of fact, whether the bill belonged to the United States; and the district judge did no more than his duty, in telling the jury that the evidence was sufficient to establish that fact.

But supposing the bill to be the property of the United States; still it is insisted, that the action should have been in the name of Mr. Tucker, their trustee, and not in the name of the cestui que trust; and much was said to show the hardship of unnecessarily exposing a party to a suit in the name of the United States, who paid no costs, and sued under several other advantages which were not common to other plaintiffs. No case has been cited to show that where a bill is endorsed to the known agent of another, for the use of the principal, as is the necessary intendment here, that an action may not be maintained in the name of such principal; but were that the case, I should say that the government ought to form an exception to the rule, and that an action might be brought in every case in the name of the United States, where it appeared on the face of the instrument, that they alone were interested in the subject matter of the controversy. This certainly is not carrying prerogative (if it deserve that name) too far. There is a fitness, that the public by its own officers, should conduct all actions in which they are interested; and the inconveniences to which individuals may be exposed in this way are but light, when weighed with those which would result from their agents always bringing actions in their own names. They might employ whom they pleased, and by negligence or otherwise, the rights of the public be jeopardized. Set-offs too might be interposed against the individual who was plaintiff, unless the court, to prevent them, would take notice of the beneficial interest of the public; and if they could do this to prevent a set-off, which courts of law have done, why not do it at once, by permitting an action to be instituted in the name of the United States? Some doubt was hinted, as to the right of the United States to sue in any case without an act of congress for the purpose. The technical difficulties which exist in England, against a civil action in the name of the king, (if it be a fact that he cannot sue in his own courts,) are not in the way of an action on the part of the United States in their courts. Judicial proceedings are not before the people of the United States, nor does the process run in their name. The court therefore has no doubt, that in all cases of contract with the United States, an action may be brought in their name, unless a different mode of bringing it be prescribed by law, which is not pretended to be the case here.

If any further evidence were required, than what appears on the bill itself, of its being the property of the United States, it may be found in the notice accompanying the plea of the plaintiff; for it is there stated, that it was agreed between him and the secretary of the treasury of the United States, that the said bill should be paid in London in the month of December following its date. The court does not rely on any usage in disposing of this part of the case, because none was proved at the trial; but the course which has

been adopted in this case of endorsing the bill to the treasurer is so convenient, that it may fairly be presumed to have been coeval with the establishment of the government. If endorsed immediately to the United States, it will at once be seen, how difficult its negotiation will afterwards become; for although, in that case, they might sue in their own name, it would not be very easy to endorse it to any other person, by which its negotiability would be altogether interrupted.

It is next said by the counsel of the plaintiff in error, that admitting that an endorsement to Mr. Tucker, the treasurer of the United States, might have passed such an interest to the United States, as to have enabled them to sue in their own name; yet, as all the endorsements prior to the one to him were in blank, neither the United States nor their treasurer showed any title to the bill; and it was also said, that, in as much as it appeared that Mr. Tucker has ·endorsed the bill to the order of Messrs. Baring Brothers & Co.. the title, if ever in him, had passed away by this last endorsement, and was at the time of trial in the gentlemen last named —they not having endorsed it back to the United States. The court will dispose of these two objections together, as nearly the same answer will serve for both of them. The mere returning of this bill, with the protests for non-acceptance and non-payment by the Messrs. Barings, to the treasurer of the United States, is strong presumptive proof that the former acted merely as agents of the latter, or as bankers of the United States. Where that is not the case, it is usual, not to send the bill back to the last endorser, but to some third person, who may apply for payment to such endorser, as well as to every other party to the bill. But be this so, or not, if the holder of a bill, whether as agent or creditor of the remitter, will send it back to the latter, the court entertains no doubt, that the party to whom it has been thus sent back, and who may·have previously endorsed it, may not only sue in his own name, but may at the trial strike out his own subsequent endorsement, and fill up all the preceding blank endorsements, so as to make them correspond with the title set forth in his declaration. Why this was not done I know not; but as it might have been done, and would be permitted on a future trial, almost as a matter of course, this court does not think it necessary or proper on that ground to reverse the judgment of the district court. It is considered rather as an objection of form, and cured by the thirty-second section of the judiciary act. Whether the Messrs. Barings might have urged any objection on the trial to striking out the endorsement to them, it becomes unnecessary to inquire. The court is to decide on the evidence which was given, and not on that which might have been given, unless such evidence had been rejected. It is on this evidence that the court is of opinion, that

the endorsement to those gentlemen, although in full, might have been obliterated if necessary on the trial; although it would perhaps be more reasonable and the better course always to presume, that the actual holder of a bill was its proprietor, unless the contrary were shown, without requiring of him to strike out any subsequent endorsement—as a bill seldom gets into the hands of a prior endorser, until all the subsequent ones are satisfied; and it may be necessary in some cases to prove, that the bill has belonged to some other person, whose name may be upon it, for the holder to avail himself of a promise made to such party, which may more easily be done where the endorsement is suffered to remain in its original shape, than after an obliteration takes place.

Another objection made at the trial, and which arose out of the evidence of the plaintiffs below, was the unreasonable delay which it was said had taken place, in presenting the bill for acceptance, and in giving notice of its protest for non-acceptance, and non-payment. The bill appears to have been presented for acceptance on the 3d day of October, 1814, which was three months after its date, and was protested on that day for non-acceptance. The court is of opinion that the presentation was in time. Even if war had not then existed between the two countries, I am not prepared to say, that this would not be deemed a timely presentation of the bill, without other circumstances appearing, than the mere fact that it was not presented until after the lapse of three months. Vessels not unfrequently have passages of that length; but when it is considered, that the bill was drawn in time of war, which renders any intercourse precarious and not of very frequent occurrence, it would be too much for any court to say, that the delay here complained of shall destroy the right of the United States to recover on this bill. Notice of the protest for non-acceptance was given to the drawer on the 12th December, 1814, but a little more than two months after date of the protest. The court is of opinion that this was also using due diligence; and that even in time of peace, no laches could have been imputed on this account to the holders of the bill. On the 5th December, 1814. a protest was made at Liverpool for non-payment of the bill, of which the plaintiff in error had notice on the 22d day of May following. after a lapse of a period of upwards of five months. This is prima facie so great a delay, that it is said, that unless the defendants in error can account for it, it must be fatal to their claim; for the damages of twenty per cent. at least; and it is further said. that the arrival of the British sloop of war Favourite, on the 12th of February, 1815, was a matter of so much notoriety, that this court can take notice of it. although no evidence was given of it at the trial. Admitting this fact to be properly before the court, it proves only that a single vessel had been des-

patched from England by way of Falmouth, nine or ten days after a treaty of peace had been signed at Ghent; but, whether the agents of the United States knew that such a vessel was to be despatched in time to write by her, does not appear. They may very well, considering the haste in which she was despatched, and the distance from London of the port from which she sailed, have known nothing of the intention of government to send the Favourite to this country. It is not stated, or proved, that any other vessel arrived from England, until the one by which the protest for non-payment came, When it is considered that the treaty of Ghent was not ratified until the latter end of February, and that it would not be known in England until some time in April, before which time no vessel could with prudence sail from that country for the United States; this court cannot say that the notice of non-payment is liable to the objection made to it at the trial; and is further of opinion that this question, there being no dispute about facts, was properly a matter of law; and that the district court did right in considering it in that light, and in instructing the jury, that the defendants in error had a right to recover, notwithstanding the alleged negligence on their part.

We may as well here dispose of some other exceptions, which have some connexion with the three just decided. It has been urged, that the twenty per cent. damages cannot be recovered, where the action is brought on a protest for non-acceptance, and before notice to the drawer of a protest for non-payment. It is not very necessary to inquire, as was done at the bar, whence the custom arose in this state, of allowing the holder of a bill of exchange, when returned under protest, not only the amount of the bill, but twenty per cent. damages, as a compensation for his disappointment. Whether it be a badge of colonial submission, or whether it has arisen out of a want of confidence which our merchants have in each other, it is now settled law, which nothing but an act of the legislature can alter; nor is it in the recollection of the court, that it has ever heard it complained of. Nor is it necessary to decide, whether on a mere protest for non-acceptance, these damages are recoverable, although it is part of the drawer's contract, that the bill shall be accepted; and its negotiability and use to the holder is greatly impaired by a refusal to accept; and as no reason can be assigned, why there should be two actions, when one will answer, it might not be difficult to argue in favour of those decisions which have determined this point against the plaintiff in error. But without laying any great stress on these decisions, it is admitted, that in this case a right of action ensued, on notice of the protest for non-acceptance. And the action was accordingly commenced, shortly after the notice was given; but not until after a protest for non-payment was made in England, although not notified to the drawer here. The declaration contains a count on the last protest; and under this count, as well as the one for non-acceptance, a general verdict was taken, which included twenty per cent. for damages. This, in the opinion of the court, was correct; for, as the action was rightly commenced, it was not improper to admit evidence of the protest for non-payment, although notice of it were not given until after the commencement of the action, in order to destroy every presumption that might have been raised of the bill's having been honoured at maturity. Where the right to recover damages is perfect at the time of trial, a plaintiff should be permitted to show it, provided the action, which is conceded to have been the case here, was not prematurely brought. The opinion of the court then, is, not only that the damages were recoverable on this state of things, but that a verdict was properly taken on both counts.

Another objection taken at the trial, which was also overruled, arose out of the supposed illegality of the transaction. The United States and Great Britain being then at war, it was unlawful for the plaintiff in error, in the opinion of his counsel, or for any other citizen of the United States, to draw a bill of exchange on any subject of Great Britain, or other person residing within the British dominions. In support of this opinion, Bynkershoeck and other writers on national law have been referred to as establishing the doctrine, that every species of intercourse or communication, whether direct or indirect, whether commercial or of any other character, whether personal or by letter, is strictly inhibited between subjects of belligerent nations, unless under the immediate license of their respective governments; and much has been said to show the extreme danger of permitting, during such a state of things, any kind of correspondence which is not sanctioned by necessity, or cannot be excused on the plea of humanity. As it regards Bynkershoeck, it is manifest, that when laying down the rule on this subject, he confines it, however general his language may be in other respects, or whatever his reasoning may be upon it, to an intercourse strictly commercial. "From the very nature of war," says he, "it cannot be doubted, that commerce between enemies must cease." This is also the meaning of other elementary writers; and it is a proposition which no court can have any disposition to quarrel with. Such a state of things must necessarily ensue upon every declaration of war. But if the dicta or reasoning of some writers, who suppose they have done nothing more than to follow the authors just referred to, are to be my guides on this occasion, it would be impossible to make any kind of communication, or have any intercourse or dealing with an enemy, however innocent in its nature, or however free from danger to the state, an exception to

the very broad rule which they have been pleased to prescribe. But without denying that a war brings all the subjects of the parties to it into a state of hostility with each other, or that they are bound to assist their respective governments, and to defeat by all lawful means in their power, the projects of the public enemy; it will not, I trust, be deemed disrespectful to those who may maintain a contrary opinion, if I cannot think it at all necessary, in order to ensure a performance of those duties, to include within this interdiction a transaction like the one now before the court, or to advance a single step further in this matter, than adjudged cases oblige me to do. Not entertaining the same apprehensions on this subject, under which some appear to have delivered their sentiments, and having no solicitude to add unnecessarily to the evils of war, I may probably regard as perfectly innocent, what others will consider as a flagrant violation of duty. I do not, therefore, subscribe to the doctrine; and never shall, until the legislature or the supreme court of the United States shall make it my duty to do so—that no kind of intercourse whatever, between enemies, is permitted.

The practice of the civilized world might safely be relied on as repugnant to the proposition, which, to the extent now contended for, was never heard of until the late war. In the present state of commerce, it is scarcely possible for a war to break out between two nations trading with each other, without the subjects of the one being more or less indebted to those of the other. Nay, it may often be necessary for the subjects of the one to remit monies to those of the other, as the best and safest way of disposing of funds which they may have abroad, and which may arise from their commerce with neutral nations. These are negotiations with which it is beneath the dignity of government to interfere. The pressure of war on the individuals of both countries is thereby, in some degree, taken off, and their governments, instead of being injured by such an innocent interchange of good offices, are enabled to prosecute the war with more vigour, without being exposed to the clamour and ill will of a large body of citizens who always suffer so much by the loss of trade. In the first case, that is, of a war's finding the subjects of the parties mutually indebted to each other, what has been done, not in one or two solitary cases, but by every merchant of this or any other country? Has it ever before occurred to any one of this numerous class of citizens, however scrupulous in other respects of violating any law of the land, that any criminality or responsibility attached by drawing a bill on his enemy for a debt due to him at the time of the war's breaking out, or contracted pending hostilities? It is difficult to perceive how such an act can add to the resources or increase the comforts of an enemy. If the bill be in fa-vour of a neutral or a citizen of the United States, the money will probably be withdrawn from the enemy's country altogether; and, if in favour of a subject of the enemy, it will but take the money out of the hands of one British subject and place it with another; and if neither be done, the money will always remain at the disposal of the party remitting, and cannot, without a violation of good faith, be added to the resources of government.

But be this as it may, the universal usage on this subject, and the entire absence of any adjudged cases, are at least primâ facie evidence of its legality. The practice of our own merchants during the late war, it is well known, was in conformity with it; for scarcely a vessel sailed from the United States during that period for any port of Europe, that was not almost loaded with bills of exchange on British houses; and although many of these were inspected by the marshal of the district, yet, we do not hear that he ever thought of stopping them in transitu, or of complaining to the executive, or to a grand jury of those who had drawn them; nor did the legislature, although every member of congress must have known of a practice which no one took any pains to conceal, ever interfere to prevent it, or lay it under any restraint whatever. To me, the fear of opening a door for intelligence to the enemy, if any intercourse of this kind be tolerated, appears perfectly chimerical. A bill may be drawn with, or without a letter of advice. In the latter case, it will hardly be pretended that the bill itself will be made the vehicle of improper intelligence. If a letter accompany the bill, it is just as liable to come to the knowledge of government or to fall into the hands of its agents as any other letter; and the same caution would be used in writing it. Persons disposed to give information to an enemy and willing to incur the hazard of it, will seldom be at a loss for opportunities. So innocent was this conduct thought during the late war, that bills on London were not only publicly sold in our cities, but cartels were probably sometimes permitted to go principally for the purpose of giving our merchants an opportunity of writing to their English correspondents, and of drawing on them for monies in their hands, or of making remittances for the payment of debts due by them, or of sending them bills on other parts of Europe to be collected for their use. If the inhibition of intercourse in time of war be as universal as is now pretended, the voluntary payment of a debt to an enemy must be a crime. Nor can a father who may have a son with the enemy, write him the most innocent letter on family affairs without subjecting himself to a public prosecution; for it will be idle to brand such conduct as criminal, unless the parties be liable to punishment in this way.

The court has indeed been referred to the

Black Book of the Admiralty, which is alleged to be as ancient as the reign of Edward III., to show that acts of this kind are in truth indictable offences, inasmuch as one of its articles directs the grand inquests to inquire of all "those who intercommune with, sell to, or buy of any enemy without special license of the king, or of his admiral." I will not deny the existence of this article, nor that it may be near five hundred years old; but as no presentment or indictment can be produced against any person during the lapse of so many centuries for drawing a bill of exchange on an enemy, or for remitting him money in payment of a debt, or for the bare remittance of money, in any other way, for the benefit of the party remitting, notwithstanding the numerous and long wars in which England has been engaged, during that period, it may very safely be concluded that such an intercourse, if it can be called by that name, common as it must have been in many of them, was never considered as the intercommunion or intercourse to be inquired of under this article; or if it was, that it has been disregarded for so many ages, and has become so obsolete that nothing but an act of the legislature can ever revive it on this side of the Atlantic.

The drawing of a bill of exchange has been called trading with an enemy. This court does not consider it in that light within the meaning of any one of the cases cited. It is easy to see that a trade properly so called, it permitted, may very well be the occasion of considerable injury to the state. It may be the means of supplying its enemy with articles of the first necessity, and might lead to personal intercourse and communications highly important, without a possibility of detection. No such danger can be apprehended from a letter covering a bill of exchange, so long as the writer of it continues at the distance of three thousand miles and more from the person to whom it is addressed. If it be unlawful to sell a bill of exchange drawn on an enemy, it is strange that in the treaty of London, commonly called Mr. Jay's treaty, the contracting parties should have thought it necessary to engage, not to sequester in the event of a war, the debts due by individuals of one nation to individuals of the other. These were neither to be destroyed nor impaired on account of national difference and discontents. If no man can take a bill of exchange in time of war, without the risk of losing his money for the illegality of the transaction, it would amount to a sequestration during hostilities, of all the funds of an American citizen in the country of the belligerent; and that without any act, on the part of the enemy's government to produce such a state of things. It is a matter of notoriety, that in conformity with the practice here stated, British subjects interested in the public debts of the United States, regularly received the interest on their stock, during the last war, which it is presumed was regularly remitted to them; which could only have been done by means of bills of exchange, without its ever being imagined that such remittance was illegal.

The opinion of the court then is, that the plaintiff, by drawing the bill in question, violated neither the laws of nations, nor any municipal regulation of his own country;—that he did an act perfectly innocent, if not meritorious, and which has too long received the sanction of public opinion and general usage, to render it necessary or proper to be checked by the interposition of a court of justice, which could not be done, without sacrificing the interests of our innocent and unsuspecting merchants, to gratify the cupidity of those who may, since have been advised that the transaction was unlawful, and may be desirous of taking advantage of it. It would require the very grave consideration of a much higher tribunal than this, to decide that such conduct is illegal, and that the persons the least guilty of those concerned, if there be any guilt at all in it, shall lose the money which he has paid for the bill, while the party who drew the bill shall not only escape punishment, but retain, without any accountability to any one, all that he may have received for it. A single judge would ponder long before he would introduce a rule so inequitable; especially, if in his own opinion, this usage were not only lawful, but harmless, and attended with no public danger whatever, and could not be suppressed without increasing in a very great and unnecessary degree, the inconveniences consequent on a war, which, even in modern times, are sufficiently extensive. If, however, the practice be liable to all the mischiefs which have been stated, it is much better, considering its inveteracy and universality, that the legislature should put a stop to it in future wars, by a positive declaration of its will on the subject, than that a court should interfere in the way now proposed. which would in fact be punishing the innocent instead of the guilty, and that too, by a judgment, which would probably be regarded by the whole body of American merchants in the light of an ex-post facto law.

But if the act of the plaintiff in drawing this bill, was really a violation of the laws of nations, what is to be its consequence? It is conceded that he cannot be punished by indictment, or in any other way, which generally follows on every offence however small. If then, he can escape punishment, one would think that he ought to be satisfied; but he asks to be remunerated at the hands of the court, by being permitted to retain all that has been received for this bill, although it is admitted that the United States have paid the full value expressed on the face of it, and that it has been returned under protest for non-payment, for want of funds in the hands of the drawee. Were the conduct of the plaintiff in error as illegal as his counsel have

represented it to be, a court would hesitate, methinks, before it would apply to his case the rule of potior est conditio defendentis. This is a new mode of enforcing national law; and this case might without difficulty, were it necessary, be distinguished from the cases in which common law courts will give no remedy for monies which have been paid, as the consideration of a contract to perform something contrary to law, although the party neglects to do what he had engaged to do. No case has been cited to show that a violation of the law of nations has ever been punished (if the expression may be allowed,) in this way; but it is unnecessary to examine this question any further, or to give any opinion on it, after the one that has been already expressed in favour of the transaction.

I have not thought it worth while to take any notice of the agency of the government, or of the executive in this business; not supposing any such agency, interest, or license, essential to give it validity. Nor has it been thought necessary to impeach or call in question the motives of the plaintiff in error. He has himself stated that he has been driven to this defence, by ill usage on the part of some of the officers of government. With this the court has nothing to do. Whatever be his motives, or whatever may have forced him to a defence, for which he has thought it necessary to offer an apology, it was the duty of the court to ascertain what the law was, apart from considerations of this kind; and if it had been satisfied that it was as it has been laid down by his counsel, a different opinion would of course have been delivered.

But it is time to proceed to the next exception. The plaintiff in error offered to give in evidence as a set-off, that the United States were indebted to him as follows: That he was on the 31st day of August, 1814, the holder of one million of dollars of their stock, created and issued under the loan of five millions of dollars contracted for by him with the secretary of the treasury, on the 2d day of May, in the same year, being part of the twenty-five millions of dollars, which the president of the United States was authorized to borrow by an act of congress passed the 24th day of March, 1814 [3 Stat. 111]; and that as holder thereof on the said 31st day of August, he was entitled to receive, and ought to have received from the United States, one hundred thousand dollars in the like stock of the United States for the additional or supplementary stocks due to him as such holder, pursuant to the aforesaid contracts made with him; and that the United States have neglected and refused to issue and to deliver the said stock to him; but did on the 30th November, 1814, issue and deliver the same to other persons unknown to him, who were alleged to be the holders of the stock on that day—whereby he had sustained damages to the amount of one hundred thousand dollars, which he claims to set off as damages for a breach of the said contract,

or as so much money had and received by the United States to his use, or as so much money lent by him to them.

This evidence was overruled by the district judge, whose opinion on that point was also excepted to. It has been made a question whether the plaintiff's right to the set-off here offered, is to be tested by the act of the legislature of the state of New York on this subject, or by the law of congress providing for "the more effectual settlement of accounts between the United States and receivers of public money." If the act of this state is our guide, it is insisted that the one which passed in 1813, is sufficiently comprehensive to include every species of set-off, arising out of any contract or demand which the defendant may have on the plaintiff, however contingent, or unliquidated, or difficult of adjustment such demand may be. Whether this act be liable, in consequence of a little alteration in its phraseology, to this mischievous construction, which is at war with all the decisions which have been made on the English act, which authorizes a set-off, and on a former law of this state; this court does not think it necessary, at present, to decide; nor whether the United States, although not named therein, are bound by it; because it is of opinion that the act of congress applies to the case before it, although the title of this act would seem to restrain it to suits against receivers of public monies, and the three first sections apply to them exclusively. But that class of debtors being provided for and disposed of in those sections, the fourth is sufficiently extensive to embrace every suit between the United States and individuals— no matter what may be the cause of action, or whether he were a receiver of public money or not. The fifth section also comprehends every person indebted to the United States, and the sixth provides that writs of execution upon any judgment in favour of the United States may run into any other state, as well as into the one in which the judgment was obtained. The whole act therefore cannot well be restrained to suits against public officers; and as the language of the fourth section is broad enough to embrace suits against any individual; and as it is as reasonable that persons in the situation of the plaintiff in error should present their claim to the accounting officers of the treasury, as those who are described in the three first sections, I see no reason for excepting him from its operation.

There is nothing unreasonable in the requisitions of this act. The accounting officers of the treasury are indifferent between the United States and the party claimant, and if dissatisfied with their decisions, he can then submit his case to a court of law. The district court therefore committed no error in overruling this evidence; and if so, it was also right in not permitting the plaintiff in error, for the purpose of getting rid of the exchange and damages, to give evidence that the United States

were indebted to him in August, 1814, in stock to a much greater amount than would have met the aforesaid bill of exchange, of which he demanded payment, and which was neglected or refused until the 30th November, 1814, when so much was paid to him as would have enabled him, if it had been paid in August, to have remitted a sufficient sum to England to pay the said bill. This would have amounted to a set-off pro tanto, and is liable to the same difficulty as the set-off which was attempted against the whole demand.

As the case of the plaintiff in error is considered by this court within the act of congress last mentioned, by which he is deprived of the set-off he attempted to make; it is but reasonable that he should be subject to pay the same rate of interest which that act prescribes, which is six per cent. per annum.

One exception more remains to be noticed. The plaintiff in error offered evidence to prove, that at the time when notice was given to him of the protest of the bill for non-acceptance, and also of its protest for non-payment, bills of exchange on England could be and were bought and sold in New York for specie at fifteen per cent. below par, although it was admitted that they could be bought at both of the last mentioned periods in the city of New York, and were bought and sold at par for current bank paper of the said city: and it was insisted by him that the rate at which they were bought and sold in specie, was the proper rule for the assessment of damages. This evidence was not admitted; and the judge directed the jury that the United States were entitled to recover the amount of the said bill, according to the rate at which bills of exchange on England were then bought and sold in New York in current bank paper of the said city which was at par, or the face of the bill; and that the jury should disregard the rate of exchange in the said city in specie. To this opinion the counsel for the plaintiff in error excepted.

The court for the correction of errors of the state of New York, having decided that the holder of a bill of exchange is entitled to recover at the rate of exchange at the time of notice of the protest's being given,—this must be considered as the law of the land; and it is hardly necessary for this court to examine whether the decision be correct or not, or whether a better rule might not have been adopted. The only proper inquiry now to be made is, whether this rule has been observed on the present occasion; for let any rule whatever be prescribed, it will not always produce equality or justice between the parties. Considering how long a settlement at par had been practiced on, at least in all the courts of this state, I can discover no very good reason for substituting in its place, the one which has now become law. The present one is more uncertain, liable to rather more difficulty in its application, and pro-

ceeds on a supposition which will not in all cases be true,—that the holder of a bill of exchange will always want another bill to replace the one which has been protested. One advantage of settling at the par of exchange, is, that the purchaser of a bill can always know beforehand exactly what he is to receive if it be dishonoured, and contracts of that kind will savour less of gambling than they now do; but after all, it is of more importance, that some certain rule be laid down, by which an adjustment is to take place, than that it should be the best rule which could have been possibly devised, about which there will always exist a difference of opinion.

Without pursuing then any further, the speculations which were indulged in at the bar, on this part of the case, this court will proceed to inquire whether, keeping in view the measure of damages introduced by the court of errors, the exception now under consideration was well taken. This involves the question, how the rate of exchange in the present case was to be ascertained? Was it to be by the standard of the bank paper then current in this city; or by that of specie? This being an action in which the United States have a right to recover gold and silver, and to receive nothing else in payment, unless it be as has been suggested, treasury notes, it would seem almost necessarily to follow, that in settling so important a question as that of the rate of exchange, no other medium but that of the precious metals could be resorted to, without the most serious injustice to the plaintiff in error. To say because bills are selling for depreciated paper not recognised as a legal currency at one hundred per cent. advance, that twice the amount of the bill shall be recovered to enable the plaintiff in such an action to buy another bill of the same amount with the first, and then to compel the defendant to pay that sum in specie, which will buy a bill of more than double the amount of the one protested, is a course of proceeding not entitled to much favour. The past moderation and forbearance of government towards its debtors, have been referred to as furnishing evidence that the plaintiff in error will not be required to pay any thing but bank paper, or treasury notes. What the government may do, can be no rule of decision. The court can only know what they have a right to do, and decide accordingly.

As to the right of paying in treasury notes, the court cannot know that this will be any relief to the party—their value being altogether fluctuating and contingent. As an article of commerce, they may be worth more or less than specie, when the plaintiff in error is called on for payment. Nor can this court take notice of bank paper being in fact current by common consent, and answering all the purposes of life. It can only take notice of the law, which compelled no man to take it for a debt, and it can notice another

fact, not only because of its notoriety, but because of its appearing on the record, that at the time we are speaking of, this paper had undergone a very great depreciation; owing no doubt, in part, to a refusal of the banks to pay specie for their bills. But it is supposed that the difference between bank paper and specie was occasioned by an appreciation of the latter, and not by a depreciation of the former. It is needless to pursue this inquiry, because it is enough for the purpose of the plaintiff in error that a difference in fact existed, and that bills of exchange could be bought on better terms for gold and silver than for paper. This being the case, and specie being the only known legal tender for a debt, it is the opinion of this court that the district court erred in rejecting the testimony which was offered to show that bills on London could be bought at the times referred to at fifteen per cent. discount in specie. This testimony should have been received, and been the basis of the assessment of damages, and not the par of exchange, merely because bills were bought at that value if paid for in a depreciated and dishonoured currency: for this error the judgment of the district court is reversed, and a venire facias de novo awarded.