## UNITED STATES v. WADE.

(Circuit Court, W. D. Missouri, W. D.  June 15, 1896.)

**1. ARMY REGULATIONS—PAYMENTS TO EXTRA-DUTY MEN.**
Under Rev. St. § 1287, and the army regulations (sections 902–905, 907), it must appear, in order to authorize payments to enlisted men for extra duty, that the service performed was not less in duration than 10 days.

**2. SAME—TRANSMISSION OF DUPLICATE PAY ROLLS—IGNORANCE OF REGULATIONS.**
Ignorance of the requirements of the army regulations, by an officer appointed to act as regimental quartermaster, during the war, in the temporary absence of the quartermaster, *held* no excuse for failure to transmit duplicate pay rolls, on which money was paid out to extra-duty men.

**3. SAME—SETTLEMENT OF ACCOUNTS—ALLOWANCE OF CREDITS.**
The first section of the act of June, 1870, authorizing the treasury accounting officers, in settling the accounts of disbursing officers of the war and navy departments, arising during the Rebellion, to allow, under certain circumstances, such credits, for overpayments, loss of funds, vouchers, and property, as they may deem just and reasonable, have no application to the case of a disbursing officer who failed to account for money received, and who never presented any claim for a credit for overpayment, or loss of funds, vouchers, or property.

**4. SAME—LOSS OF PROPERTY.**
The second section of said act, which authorizes the approval and closing of the accounts of military officers "for government property charged to them" whenever, in the judgment of the accounting officer, it is for the interest of the United States to do so, in the absence of fraud, relates only to property charged against officers, such as ordnance stores, equipments, quartermaster supplies, etc., in contradistinction to the class of property and funds committed to disbursing officers.

**5. SAME—SETTLEMENT OF QUARTERMASTER'S ACCOUNTS.**
The allowance of a credit to the assistant quartermaster of the army, for a sum of money turned over by him to an acting regimental quartermaster, for which the latter failed to account, and the settlement of his accounts, *held* not to have operated to release such acting regimental quartermaster from his liability to account for such money.

**6. SAME—ACTIONS BY GOVERNMENT—CLAIMS FOR CREDIT—PRESENTATION TO ACCOUNTING OFFICERS.**
Rev. St. § 951, forbidding individuals sued by the United States to claim any credit which has not previously been presented to the treasury accounting officers and disallowed, unless defendant, at the time of trial, is in possession of vouchers not before in his power to procure, applies to a suit brought against one who failed to account for money received during the war as acting regimental quartermaster.

This was an action by the United States against William H. Wade to recover a sum of money alleged to be due.

John R. Walker, for plaintiff.

Geo. A. Neal, for defendant.

PHILIPS, District Judge.  This suit was instituted on the 5th day of July, 1887.  The petition, in substance, alleges that on the 13th day of September, 1862, the defendant was captain and acting regimental quartermaster in the thirty-first regiment, Ohio volunteers; that on said day he received from one Mackay, assistant quartermaster of the army, the sum of $485.15, the money of the United States; that he took said money into his custody, as such officer, for and on behalf of the United States; and that he has

failed and refused to account therefor, and pay over the same to the plaintiff. Service of summons was not had on defendant, on account of his absence from his usual place of residence, until August, 1889. In September, 1889, the defendant filed an answer denying generally all the allegations of the petition. The cause has been continued from time to time under the general statement that defendant expected to effect a settlement with the government. On the 10th day of May, 1895, by written consent of the parties, the cause was referred to J. D. Parkinson, Esq., with directions to take the evidence and make his findings, and report the same to this court. Afterwards, on the 18th day of June, 1895, the defendant filed an amended answer, admitting that he was, at the time mentioned in the petition, such officer and acting quartermaster, and that he received said money through said Mackay. The answer then alleges that said money was so received by said defendant for the purpose of paying men and soldiers as extra-duty men, and that he so paid out the same, with the exception of $60, not paid out on account of the absence of the men, which was paid back by him to one Harmon, acting assistant quartermaster of the army. The answer further alleges that defendant made settlement of account with the second auditor of the treasury. On the 12th day of May, 1896, the referee filed his report, the substance of which is that he finds the issues for the defendant; that the money received by defendant was properly disbursed and paid out. To this report the district attorney has presented various exceptions, on the ground that the report of facts by the master is imperfect, and that the findings are contrary to the facts in evidence, and against the law. The report of the referee, instead of finding all the material facts of the case, reports the evidence merely by way of reference to the files and depositions and oral testimony. It therefore became necessary to a proper determination of the case that the court should examine in detail all of the exhibits and testimony.

The evidence discloses the fact that in 1862 a question arose in said regiment, whether or not certain men connected therewith were entitled to extra pay, as extra-duty men. The acting regimental quartermaster being absent on detailed duty, by direction of the colonel commanding this regiment, the defendant, being a captain of a company therein, accepted the duty of the regimental quartermaster, and took it upon himself to apply to said Mackay for money with which to pay said claimants. It is quite apparent from the testimony of one Williams, who was commissary of said regiment, who testified on behalf of defendant, that the pay roll on which defendant claims to have paid out this money was made out by the quartermaster sergeant of the regiment about the time defendant obtained this money. He testified that:

"Mr. Babbitt claimed the extra-duty men at regimental headquarters were not entitled to extra pay, but after considerable controversy there was a pay roll made out, and the extra-duty men were paid, with the exception of Andy Campbell, who was adjutant's clerk."

The defendant himself testified that the so-called extra-duty men were principally teamsters; that he did not think the man Campbell

was entitled to such pay, but that he afterwards did pay him $100, by order of the colonel of the regiment. This order was not produced in evidence, as defendant claims he did not know what became of it; nor did the colonel, when questioned about it, have much recollection of the transaction. The names of none of the men thus claimed to have been paid are remembered by any of the witnesses for defendant, nor can the defendant give their names, or the amounts paid them, respectively; nor can he state for how many days' work they were paid. The statute (section 1287) authorizes such extra pay only to soldiers when detailed for employment "as artificers, or laborers in the construction of permanent military works, public roads, or other constant labor of not less than ten days duration." The army regulations, which have the force and effect of law (sections 902–905, 907), make specific prescriptions and limitations with regard to this character of service. Section 902 gives certain extra pay to men employed east of the Rocky mountains, and certain pay to men employed at all other stations west of the mountains. Section 903 declares that enlisted men in the ordnance, in the engineer departments, and artificers, and in the artillery, are not entitled to this pay. Section 904 prohibits the employment of extra-duty men or soldiers or any laborer in camp or garrison which can be properly performed by fatigue parties. Section 905 declares that no extra-duty men, except those required for the ordinary service of the quartermaster, commissary, medical department, and saddlers in mounted companies, shall be employed, without previous authority from department headquarters, except in emergency, to be promptly reported to the department commander. So it is obvious, both from the statute and the army regulations, that, to authorize the disbursement of this money to enlisted men for extra duty, it should appear that the service performed by them was not less in duration than 10 days. Section 1141 of the army regulations provides that:

"Duplicate rolls of the extra-duty men to be paid by the quartermaster department will be made monthly and certified by the quartermaster or other officer having charge of the work, and countersigned by the commanding officer. One of these will be transmitted direct to the quartermaster general and filed in support of the pay rolls."

This was not observed by the defendant. He never transmitted to the quartermaster's department, nor to any other department of the government, such pay roll, or any copy thereof. It was not consistent with the public interests that a regimental quartermaster, or officer of the line, should be invested with authority, ad libitum, to pay out public moneys when and to whom he might select. He could pay out this money to such persons only as might be entitled thereto under the law. And it was clearly his duty, as the disbursing agent, to see that the persons named on the pay roll were such as were entitled to extra pay; and he could not devolve that duty on any other person, so as to escape responsibility for his action, nor accept any person's ipse dixit as to the merits of the claimants. As a safeguard to the public treasury, his action in making such disbursement was subject to review and approval, before he could

be acquitted of his accountability, by the quartermaster general's department, and the third auditor of the treasury. The evidence shows that the defendant, and others connected with the company, made question, before paying the claimants, as to whether or not they were entitled thereto; showing that he did not accept the pay roll itself, made out by some subordinate like the quartermaster sergeant, as conclusive. The man Campbell, for instance, who was paid $100 of this fund, was a mere clerk to the adjutant of the regiment. It does not even appear that he was an enlisted man. The colonel of the regiment had no authority to direct the defendant in making payment to such a man, any more than if Campbell had been a camp follower. No opportunity was accorded to the quartermaster general's department to revise and rectify this pay roll, for the reason that the defendant failed to make any return of this voucher to the department. The defendant's statement respecting this matter is that he was unfamiliar with the statute and army regulations. "Ignorantia legis neminem excusat." But it would seem, in the absence of any positive regulation, the plain, common-sense method of doing any business of that character should have dictated, instinctively, to a man of this defendant's unquestionable intelligence and aptitude, that having solicited, as he did, the payment over to him of this money, to be by him applied to a public use, he should, of course, render some account to the government of his stewardship. This is so palpable that, without impugning the integrity of the defendant, he must admit inexcusable negligence on his part. Having accepted the money, and undertaken, by virtue of his office, to apply it to a permissible use, he assumed the responsibility attaching to his office.

The further testimony of the defendant is that he retained this extra pay roll in his possession until his command marched from Tennessee east, across the continent, and that, with other papers, he left it in a warehouse in the state of Alabama until mustered out of this regiment, in September, 1864, when he went to Washington to collect pay due him as captain; that he employed a man named Stephens, of Washington City (a claim agent), to attend to the matter of obtaining his pay; that this agent obtained for him, from the quartermaster's department, and from the second auditor of the treasury, certificates of nonindebtedness, whereby he obtained his pay. He admits that no application was made to the third auditor for such certificate, who alone had jurisdiction in the final settlement of accounts with quartermasters. His statement, further, is: That he took said pay roll of the extra-duty men with him to Washington, and showed it to said agent, who advised him that it was not necessary to present it, as he already had the certificates on which to draw his pay. Thereat, the defendant testified, he threw this pay roll, with other papers, onto the window sill in Stephens' office, and has not seen them since. That, when he afterwards communicated with Stephens about the matter, he disclaimed any knowledge of the transaction. In one part of his testimony the defendant, through inadvertence, presents the idea that when he was trying to effect a settlement with the department, to

obtain his pay, he made an affidavit respecting this pay roll, which was filed with some division,—which one, he does not know. This is manifestly incorrect, for the reason that, according to his preceding statement, he had this pay roll with him at Washington, and showed it to the agent at the time. So, if there had been any occasion for explanation, the pay roll itself was present. Later on, however, in his cross-examination, he rectified this statement by, in effect, saying it had no reference to such voucher. The affidavit made by him, evidently, was one of nonindebtedness on his part, in order to effect a settlement of his account for pay as captain. There was no record against him at that time, in the auditor's department, on account of this money. On the contrary, at that time this money stood on the books of the auditor's department as a charge against Mackay, to whom it had been turned over by the department, who did not obtain credit therefor in his final settlements until 1874, when he filed the defendant's receipt therefor to him. Thereupon the defendant was charged on the books of the auditor's department with this money. The referee, in respect of this phase of the case, makes this finding:

"While this actual, but not conclusive, election to hold Mackay responsible was being asserted, a general (not special) two-year act, approved June, 1870, and continued in force by renewals till 1876, was passed, authorizing such credits where actual fraud against the government was not apparent. This act, and Mackay's credit, is similar, in effect, upon the government's cause of action for this amount, as if Mackay had paid or satisfied a judgment against him for this identical sum."

This finding is not sustained either by the law or the facts applicable to this case. In the first place, the act of 1870 had no application to the settlement with Mackay. The first section authorized the proper accounting officer of the treasury department—

"In the settlement of the accounts of disbursing officers of the war and navy departments arising since the commencement of the Rebellion and prior to the 26th day of August, 1866, to allow such credits for overpayments and for losses of funds, vouchers, and property, as they may deem just and reasonable, when recommended under authority of the secretaries of war and navy, by the heads of military and naval bureaus, to which such accounts respectively pertain."

As Mackay neither claimed credit for any overpayment, or loss of funds, voucher, or property, this provision of the statute had no application to his case.

The second section of this act provides for the approval of the accounts of military officers "for government property charged to them," which might be closed by the proper accounting officer whenever, in his judgment, it is for the interest of the United States to do so, in the absence of fraud. This section evidently applies to the matter of closing accounts of officers for property charged to them, such as ordnance stores, equipments, quartermaster supplies, and the like, in contradistinction to that class of funds and property committed to disbursing officers.

The department settled the account of Mackay, allowing him credit for the $485.15 turned over by him to the defendant, on the production of the defendant's receipt therefor. This in no wise

acquitted the defendant of his liability to account to the government for the fund so received by him, whether rightfully or wrongfully. The money still belongs to the government. The defendant having received it officially, he was bound to account for it. He was "individually responsible for all the money he received in his public capacity." Walton v. U. S., 9 Wheat. 656. He could not appropriate this money to his own use, or pervert it to unauthorized uses; and, until the government receives satisfaction therefor, it is a continuing liability, enforceable against the voluntary recipient, as for money had and received. Having neglected his own duty, by failing to render an account to the government, with his vouchers, which he claims to have had for two years in his possession, and which, according to his own statement, he indifferently abandoned in the office of the man Stephens, without so much as asking of him to take the custody thereof, there is little grace in the complaint that the government, by not earlier making demand on him, deprived him of the benefit of the act of congress of 1870–74. The utmost he could have claimed, even if notified to settle while said act was in force, was that he thoughtlessly abandoned the voucher, the pay roll evidencing his payments, two years after he was required by law to forward a copy thereof to the quartermaster's department. Even had he done this, the matter would have been subject to investigation by the quartermaster's department, and to settlement by the third auditor, as to whether the persons to whom the money is claimed to have been paid were entitled thereto under the law, before he could have been credited therewith.

This brings us to the consideration of section 951, Rev. St.:

"In suits brought by the United States against individuals no claim for a credit shall be admitted, upon trial, except such as appear to have been presented to the accounting officers of the treasury, for their examination, and to have been by them disallowed, in whole or in part, unless it is proved to the satisfaction of the court that the defendant is, at the time of the trial, in possession of vouchers not before in his power to procure, and that he was prevented from exhibiting a claim for such credit at the treasury by absence from the United States, or by some unavoidable accident."

The referee finds, as a matter of law, that this statute has no application to this case. Why not? From what has already been said respecting the necessity of making report to the quartermaster's department of this claim of payment to extra-duty men, the policy and wisdom of this statute clearly appear. Had this defendant made such return at the time when the means of ascertaining the facts were accessible to the accounting officers and himself, the whole matter might have been intelligently and justly adjusted. It has been the policy of the government, as expressed by act of congress, since 1797, to require officers, agents, contractors, et id omne genus, before they can be heard to claim credits against the government when sued for an accounting, to show that they have presented claims therefor to the public accounting officers of the government for examination, and that they have been disallowed, unless excused therefrom by the saving clause of the statute. The object of this statute is to adjust and settle all accounts and credits between the parties. U. S. v. Wilkins, 6 Wheat. 135; U. S. v. Fille-

brown, 7 Pet. 28. It embraces every suit between the United States and individuals. U. S. v. Ingersoll, Crabbe, 135, Fed. Cas. No. 15,-440; U. S. v. Barker, 1 Paine, 156, Fed. Cas. No. 14,517. It applies to such military officer as was the defendant, where money is expended by him in an official capacity, and credit claimed therefor. U. S. v. Lent, 1 Paine, 417, Fed. Cas. No. 15,593. The statute makes no limitations as to either the origin or nature of the claim for credit. The answer itself shows that the very nature of the defendant's defense is that he is entitled to a credit on account of money charged against him as to $425 disbursed in payment of extra-duty men, and for $60 turned over, in effect, to the quartermaster's department. As this $60 was properly accounted for by Harmon, to whom defendant paid over the same, the books in the auditor's office credited the defendant therewith; and the question here presented is whether he shall, in this suit, be entitled to further credit for the money alleged to have been paid over to the extra-duty men. Having failed to present his claim for this credit, he can be heard thereon in this suit only on the ground that he now has therefor vouchers which he could not before produce or procure. Watkins v. U. S., 9 Wall. 759; Halliburton v. U. S., 13 Wall. 63; Western Union R. Co. v. U. S., 101 U. S. 543; U. S. v. Austin, 2 Cliff. 325, Fed. Cas. No. 14,480. Long prior to the institution of this suit the defendant was invited by the third auditor to present his claim for credit, with proofs or affidavits of loss. Instead of doing so, as shown by his testimony herein, he requested the government, through the district attorney, to bring suit against him, which invitation was accepted, and here he is. Without imputing to the defendant any mala fides or fraudulent intent, the law arising on the facts of the case is with the government. It follows that the exceptions to the special findings of the referee are sustained.